jIN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| TARA GRIM<br>*Plaintiff*,<br><br>v.<br><br>BALTIMORE POLICE DEPARTMENT<br>*et al.*,<br>*Defendants*. | Civil Action No. ELH-18-3864 |

**MEMORANDUM OPINION**

This civil rights action arises from a traffic stop that occurred in the early evening of January 1, 2016. Plaintiff Tara Grim has sued the Baltimore City Police Department ("BPD"); BPD Officer Marcos Paul, who conducted the traffic stop; former BPD Commissioner Kevin Davis; "Unknown Supervisors" of the BPD; the Mayor and City Council of Baltimore (the "City"); and the State of Maryland (the "State"), alleging that, during the traffic stop, Officer Paul groped her breasts and exposed her vagina and buttocks, under the guise of a search. ECF 13 (the "Amended Complaint").[1] According to plaintiff, defendants violated the Fourth and Fourteenth Amendments to the Constitution as well as the Maryland Declaration of Rights and common law. The individual defendants have been sued in their personal and official capacities. *Id.* ¶¶ 9, 10, 11.

The Amended Complaint contains seven counts. Count I lodges a "*Monell*" claim against the BPD and Davis, pursuant to 42 U.S.C. § 1983. *Id.* ¶¶ 49-55; *see Monell v. New York City*

---

[1] The State moved to dismiss the Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). ECF 18. Thereafter, plaintiff filed a Notice of Voluntary Dismissal (ECF 26), which I approved by Order of April 2, 2019. ECF 27.

*Dep't of Soc. Servs.*, 436 U.S. 658 (1978). In particular, Grim asserts two theories of liability. First, she contends that the BPD and Davis had "a policy, practice or custom of condoning unlawful strip searches." ECF 13, ¶ 50. Second, she maintains that the BPD and Davis "failed to adequately supervise, train, or discipline their employees," regarding unconstitutional strip searches. *Id.* ¶ 54. Count II sets forth a "Supervisory Liability" claim under § 1983 against Davis and the Unknown Supervisors. *Id.* ¶¶ 56-62. In Count III, plaintiff asserts a § 1983 claim against Officer Paul, alleging an unlawful search and seizure, in violation of the Fourth Amendment. *Id.* ¶¶ 63-71. Count IV, lodged against the BPD and Davis, is styled as a "Pattern and Practice" claim under Maryland law. *Id.* ¶¶ 72-77. Count V asserts that Officer Paul violated unspecified provisions of the Maryland Declaration of Rights. *Id.* ¶¶ 78-87. Count VI contains a claim against Officer Paul under Maryland law for intentional infliction of emotional distress. *Id.* ¶¶ 88-91. And, in Count VII, plaintiff seeks "Indemnification" from the BPD and the City. *Id.* ¶¶ 92-95.

Five motions are now pending. The City has moved to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6) (ECF 19), supported by a memorandum of law. ECF 19-1 (collectively, the "City Motion"). The BPD and Davis have also moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6) (ECF 20), supported by a memorandum of law. ECF 20-1 (collectively, the "BPD Motion"). In a consolidated submission, plaintiff opposes the City Motion and the BPD Motion. ECF 25 ("Opposition"). The City and the BPD have replied. ECF 28; ECF 29.

In addition, plaintiff has filed three motions against Officer Paul. She has filed a motion for default judgment as to Officer Paul (ECF 31), and another titled "Motion to Treat as Conceded Plaintiff's Motion For Default Judgment Against Defendant Paul Marcos." ECF 34 (collectively, the "Motion for Default Judgment"). Plaintiff has also filed a motion for attorney's fees and costs in regard to service of the suit on Officer Paul. ECF 32 (the "Motion for Fees").

No hearing is necessary to resolve the motions.  *See* Local Rule 105(6).  For the reasons that follow, I shall grant the City Motion (ECF 19); grant in part and deny in part the BPD Motion (ECF 20); deny the Motion for Default Judgment (ECF 31; ECF 34); and deny the Motion for Fees (ECF 32).

## I.    Factual and Procedural Background[2]

### A.  The Incident

On January 1, 2016, at approximately 7:00 P.M, BPD Officer Marcos Paul effectuated a traffic stop of Grim while she was driving on Greenspring Avenue in Baltimore, Maryland.  ECF 13, ¶ 15.  After Officer Paul checked Grim's license and registration, he asked Grim questions unrelated to the stop, including why she had a child's car seat in her backseat and where she worked.  *Id.* ¶¶ 16, 17.  Officer Paul told Grim that she needed to follow his patrol car to a separate location, so that he could conduct a search of her vehicle.  *Id.* ¶ 18.  When Grim questioned this procedure, Officer Paul responded that she could either obey his command or be arrested.  *Id*.

"[T]errified," Grim followed Officer Paul's patrol car.  *Id.* ¶ 19.  While driving, she tried to call a friend on her cell phone.  *Id.*  However, Officer Paul stopped abruptly and screamed out of his window that Grim "better not be on [her] fucking phone."  *Id.* ¶ 20.  Grim was unable to reach her friend.  *Id.* ¶ 19.

Grim followed Officer Paul to a "secluded area."  *Id.* ¶ 21.  There, Officer Paul searched Grim's vehicle.  *Id*.  Next, he searched Grim's person.  According to plaintiff, Officer Paul "unzipped her jacket and groped her breasts."  *Id.* ¶ 22.  Officer Paul then "pulled the front area of Ms. Grim's leggings, exposing her genitalia," and "shined a flashlight down Ms. Grim's leggings and viewed her genitalia in the guise of a 'search.'"  *Id.* ¶ 23.  Similarly, Officer Paul

---

[2] Given the posture of this case, I must assume the truth of the facts alleged by plaintiff.

proceeded to "pull[] the rear area of Ms. Grim's leggings," exposing her buttocks. *Id.* ¶ 24. Again, he shined the flashlight down her leggings. *Id.*

Plaintiff, who was pregnant at the time, was "convinced that the officer was going to rape her." *Id.* She was both "frightened and humiliated." *Id.*

When another vehicle approached, Officer Paul ceased his action. *Id.* ¶ 25. Although Officer Paul told Grim that she could leave, he also said he would follow her home. *Id.* Officer Paul did not issue a citation or a ticket to Grim. *Id.* ¶ 26. Plaintiff drove to her residence on Greenspring Avenue, where she was living with her uncle. *Id.* ¶ 26. Officer Paul followed Grim, and said "words to the effect of, 'so this is where you live'" and "words to the effect of, 'I'll be contacting you for counseling.'" *Id.* ¶ 28.

Grim entered her home and told her sister and uncle what had just happened. *Id.* ¶ 30. Her sister called 911. *Id.* ¶ 31. Officer Paul initially responded to the 911 call, but he soon left the scene. *Id.* ¶ 32. Shortly thereafter, a BPD detective arrived and interviewed Grim about the stop. *Id.* ¶ 33. Grim provided a recorded statement to the BPD on January 5, 2016. *Id.* ¶ 34.

Scared for her safety, Grim changed homes and sold her car. *Id.* ¶ 35. In addition, plaintiff alleges that she "was unable to perform her day-to-day functions and lost her job." *Id.* ¶ 36.

### B. Pattern and Practice Allegations

Plaintiff alleges that the "unconstitutional strip search was not an isolated event." *Id.* ¶ 43. Rather, she alleges that "it was undertaken pursuant to, and caused by, BPD's policy and practice of providing deficient oversight and accountability, failure to train, supervise and discipline its officers, failing to reliably record when officers conduct a frisk, failing to ensure that officers comply with its strip search policy, failing to separately categorize or track complaints alleging

unlawful strip searches and internal affairs officials failing to adequately investigate complaints that officers violate its strip search policy." *Id.*

To bolster these allegations, plaintiff quotes various portions of an investigative report issued by the Department of Justice ("DOJ") on August 10, 2016, regarding BPD policies and procedures (the "DOJ Report"). *Id.* ¶ 37. According to the Amended Complaint, the DOJ Report contains the following findings:

- "'BPD stops, searches, and arrests individuals on Baltimore streets without the reasonable suspicion or probable cause required by the Fourth Amendment.'" *Id.* ¶ 37.

- "[T]he 'BPD does not reliably record when officers conduct a frisk.'" *Id.* ¶ 38.

- "Betweeen [sic] 2011 and 2016, the BPD had more than 60 complaints of unlawful strip searches." *Id.* ¶ 39.

- "'[O]fficers in BPD's Eastern District publicly strip-searched a woman following a routine traffic stop for a missing headlight. Officers ordered the woman to exit her vehicle, remove her clothes, and stand on the sidewalk to be searched. The woman asked the male officer in charge, 'I really gotta take all my clothes off?' The male officer replied 'yeah' and ordered a female officer to strip search the woman. The female officer then put on purple latex gloves, pulled up the woman's shirt and searched around her bra. Finding no weapons or contraband around the woman's chest, the officer then pulled down the woman's underwear and searched her anal cavity. This search again found no evidence of wrongdoing and the officers released the woman without charges. Indeed, the woman received only a repair order for her headlight. The search occurred in full view of the street, . . . . After the woman filed a complaint, BPD investigators corroborated the woman's story with testimony from several witnesses and by recovering the female officer's latex gloves from the search location. . . . The male officer who ordered the search received only a 'simple reprimand' and an instruction that he could not serve as an officer in charge until he was 'properly trained.'" *Id.*

- "'[I]n September 2014, a man filed a complaint stating that an officer in the Central District searched him several days in a row, including 'undoing his pants' and searching his 'hindquarters' on a public street. When the strip search did not find contraband, the officer told the man to leave the area and warned that the officer would search him again every time he returned. The man then filed a complaint with Internal Affairs and identified the officer who conducted

the strip search by name. When Internal Affairs investigators pressed the man to provide a detailed description of the officer, the man recalled that the officer 'had red patches with sergeant stripes' on his uniform. The investigator recognized this description as patches worn by the officer in charge of a shift and confirmed that the officer named by the man was working as an officer in charge in the Central District on the dates the man alleged he was strip-searched. Internal Affairs nonetheless deemed the complaint 'not sustained' without further explanation.'" *Id.* ¶ 40.

- "'[D]eficient oversight and accountability has helped perpetuate BPD's use of unlawful strip searches. Although the Department's policy limits strip searches to specific, narrow circumstances following an arrest, BPD supervisors have failed to ensure that officers comply with this policy and internal affairs officials have not adequately investigated frequent complaints that officers violate it. BPD does not separately categorize or track complaints alleging unlawful strip searches. But our manual review of BPD's Internal Affairs database revealed more than 60 such complaints in the last six years—only one of which was sustained. In response to dozens of other strip search complaints, IA has deemed them 'administratively closed,' classified them solely for 'administrative tracking,' or found them not sustained—after minimal, if any, investigation. For example, in 2015 an African American man filed a complaint that he was strip-searched by an officer whom the BPD eventually fired in 2016 after numerous allegations of misconduct. The man stated that the officer ordered him out of his vehicle during a traffic stop and searched the vehicle without the man's consent. When the stop of the vehicle did not uncover any contraband, the officer pulled down the man's pants and underwear, exposing his genitalia on the side of a public street, and then strip-searched him. The officer seized marijuana and cash during the strip search and allegedly told the man that the officer would return his money and drugs if the man provided information about more serious crimes. The complaint stated that when the man did not provide this information, the officer arrested him and turned over only part of the confiscated money, keeping more than $500. Despite the serious charges in this complaint and the officer's lengthy record of alleged misconduct, IA deemed it 'administratively closed' without intervening the complaint. This type of inadequate oversight has allowed BPD's unlawful strip search practice to continue.'" *Id.* ¶ 41.

### C. Procedural History as to Officer Paul

Plaintiff filed her Complaint on December 14, 2018. ECF 1. Summons were issued on December 17, 2018, and were returned executed as to the BPD, the State, the City, and Davis on February 14, 2019. ECF 6.

On March 8, 2019, plaintiff filed her Amended Complaint. ECF 14. The same day, plaintiff filed a document titled "Notice Of Lawsuit And Waiver of Summons." ECF 14 ("Waiver"). Plaintiff addressed the Waiver to Christopher C. Jeffries, an attorney at Kramon & Graham, P.A. *Id.* at 1. Grim stated that, based on "correspondence with counsel for the Baltimore Police Department," she understood Jeffries to be representing Officer Paul. *Id.* The Waiver cautioned that if Officer Paul did not consent to waive service, plaintiff would "ask the Court to require Mr. Paul to pay the expense of making service." *Id.* at 2.

The Court received a letter from Officer Paul On March 22, 2019. ECF 16.[3] He acknowledged having been apprised of plaintiff's lawsuit. *Id.* But, he stated: "I have not received any letter and/or information to this case. I have not received any summons nor have I been served." *Id.* In his letter, Officer Paul provided the Court with his current address. *Id.* By Order of April 1, 2019, I directed plaintiff to serve Officer Paul by April 23, 2019, or show cause as to why the claims against him should not be dismissed under Fed. R. Civ. P. 4(m) and Local Rule 103.8. ECF 17.

The State moved to dismiss on April 3, 2019. ECF 18. Shortly thereafter, on April 8, 2019, the BPD and the City each filed a motion to dismiss. ECF 19; ECF 20.

On April 17, 2019, plaintiff filed a Motion to Reissue Summons and Extend Time for Service of Process. ECF 21. Plaintiff represented that "[o]n March 8, 2019, Plaintiff emailed and mailed via certified mail the Notice of Lawsuit and Request to Waive Service of Process to counsel for Defendant Paul." *Id.* ¶ 12. According to plaintiff, Jeffries acknowledged receipt of the Waiver on March 18, 2019, *id.* ¶ 13, but informed her on April 4, 2019, that Officer Paul "has not agreed

---

[3] Officer Paul's letter was filed under seal, as it contains his address and contact information.

to waive formal service." *Id.* ¶ 14. I granted the motion, extending the service deadline to June 17, 2019. ECF 22.

Plaintiff filed the Opposition on April 22, 2019. ECF 25. The same day, she also filed a Notice of Voluntary Dismissal as to the State (ECF 26), which I promptly approved. ECF 27. And, I denied ECF 18 as moot. *Id.* The BPD and City each filed a reply on May 6, 2019. ECF 28; ECF 29.

Summons were returned executed as to Officer Paul on May 22, 2019. ECF 30. According to the summons, Officer Paul was personally served at his residence in York, Pennsylvania on May 16, 2019. *Id.* Plaintiff filed the Motion for Default Judgment on June 10, 2019. ECF 31. The next day, she filed the Motion for Fees, pursuant to Fed. R. Civ. P. 4(d)(2). ECF 32.

On June 12, 2019, the Court received a letter from Jeffries. ECF 33. It stated: "On February 14, 2019, I received a letter from the City of Baltimore's Department of Law assigning my firm to represent Mr. Paul. On that date, I also received a copy of a letter directed to Mr. Paul at a Maryland address indicating that Mr. Paul may elect to have his assigned counsel represent him, or select counsel of his choosing." *Id.* at 1. However, despite "hav[ing] tried on multiple occasions—via phone, letter, and text message—to contact Mr. Paul," he "has never responded to these communications." *Id.* Further, Jeffries stated that he informed plaintiff that because he did not represent Officer Paul, he could not waive service of process on his behalf. *Id.* at 2.

On July 1, 2019, plaintiff moved the Court "to treat as conceded" the Motion for Default Judgment against Officer Paul. ECF 34.

## II.     Motions to Dismiss[4]

### A.  Standard of Review: Rule 12(b)(6).

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do

---

[4] As noted, the BPD Motion was filed on behalf of the BPD and Davis.  The City also moved to dismiss.

not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations

allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards,* 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.'*" *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways, Inc.,* 510 F.3d 442, 450 (4th Cir. 2007). No exhibits were attached to the Amended Complaint or to the motions to dismiss.

A court "may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*,

791 F.3d at 508; *see* Fed. R. Evid. 201(b) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 6367 F.3d 462, 466 (4th Cir.), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Accordingly, "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web. *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007); *cf. Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227 (4th Cir. 2013) (noting that the court may take judicial notice of information on a website, "so long as the web site's authenticity is not in dispute"). However, "these facts [must be] construed in the light most favorable" to the nonmovant. *Clatterbuck*, 708 F.3d at 557.

In resolving the BPD Motion and the City Motion, I have taken judicial notice of the fact that Kevin Davis served as BPD Commissioner between July 8, 2015, and January 19, 2018. *See* Kevin Rector, *Baltimore Police Commissioner Kevin Davis Fired by Mayor Pugh, Citing Rising Crime*, The Baltimore Sun (Jan. 19, 2018 1:35 P.M.), https://bit.ly/2VKPDCF; *Who Is Baltimore's Interim Commissioner Kevin Davis?*, CBS Baltimore (July 9, 2015 10:50 A.M.), https://cbsloc.al/2MGlLDo.

### B.  Section 1983

Plaintiff lodges multiple claims against the BPD and Davis under 42 U.S.C. § 1983. Specifically, Count I asserts a *Monell* claim against the BPD and Davis for condoning a custom or policy of unlawful strip searches and for failing to supervise, train, or discipline employees with respect to conducting such searches. ECF 13 at 10-11. And, in Count II, plaintiff asserts supervisory liability, alleging that Davis and the Unknown Supervisors failed "to take necessary remedial and preventive actions and measures to protect against such constitutional violations,

resulting in the injuries suffered by Ms. Grim." *Id.* at 12. The BPD and Davis have moved to dismiss both counts.

1. Section 1983 generally

Pursuant to 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 135 S. Ct. 1893 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cty. v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

2. *Monell* generally

A municipality is subject to suit under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). The Supreme Court determined in *Monell* that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government resulting in a violation of the plaintiff's rights. *Id.* at 690-91. The *Monell* Court explained that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). But, liability attaches "only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 Fed. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S. at 665-683, 98 S. Ct. 2018). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691, 98 S. Ct. 2018; *Canton*, 489 U.S. at 392, 109 S. Ct. 1197; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L.Ed.2d 626 [] (1997) (collecting cases).

Thus, a viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

However, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94. Rather, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, ___ U.S. ___, ___, 138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan*, 743 F.2d at 229. In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); *see Moore v. Howard Cty. Police Dep't*, CCB-10-1430, 2010 WL 4722043, at *2 (D. Md. Nov. 15, 2010).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403-04.

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted). In addition, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

Notably, "[o]utside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387; *see Holloman*, 661 Fed. App'x at 799. In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a

general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that, to establish a *Monell* claim, the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (Quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*). Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).

### C. Sovereign Immunity

The BPD and Davis invoke sovereign immunity, asserting that the Eleventh Amendment precludes plaintiff's *Monell* claim (Count I), and that State immunity forecloses plaintiff's pattern-

and-practice claim (Count IV). ECF 20-1 at 18-21, 21-24.[5] Plaintiff concedes that the BPD should be dismissed from Count IV. ECF 25 at 16 n.3. And, she appears to agree that Count IV should be dismissed as to Davis in his official capacity. *See id.* However, plaintiff maintains that the "BPD and the Commissioner are not arms of the State for Eleventh Amendment Immunity purposes given their close connection to Baltimore City" and therefore are not entitled to immunity with respect to Count I. *Id.* at 11.

### 1. Eleventh Amendment immunity

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or subjects of any Foreign State." U.S. Const. amend XI.

Under the Eleventh Amendment, states generally enjoy immunity from suits brought in federal court by their own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."). Therefore, absent consent or a valid congressional abrogation of sovereign immunity, the Eleventh Amendment bars a private individual from bringing suit against a state in federal court to recover damages, unless there is an exception to sovereign immunity. *See Coleman v. Court of Appeals of Md.*, 556 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011); *see also Seminole*

---

[5] The BPD Motion does not address whether Davis is entitled to Eleventh Amendment immunity as to plaintiff's supervisory liability claim, lodged under § 1983.

18

*Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted); *Edelman v. Jordan*, 415 U.S. 651 (1974).[6]

The Eleventh Amendment did not create sovereign immunity, however. Rather, it preserved the sovereign immunity that the states enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011). State sovereign immunity "accord[s] states the dignity that is consistent with their status as sovereign entities[.]" *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

The Fourth Circuit has recognized that the defense of sovereign immunity is a jurisdictional bar, stating that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)). Moreover, a defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

Of relevance here, state sovereign immunity also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state," including state agencies. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant

---

[6] State sovereign immunity "is an immunity from private suit; it does not . . . bar federal enforcement actions." *Passaro v. Virgina*, 935 F.3d 243, 248 (4th Cir. 2019) (citing *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 71 n.14 (1996)).

is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 100 (4th Cir. 2019); *McCray v. Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).

The Fourth Circuit has identified three exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state. In *Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

Notably, sovereign immunity has not been congressionally abrogated for claims under § 1983. *See Quern v. Jordan*, 440 U.S. 332 (1979). In *Quern*, 440 U.S. at 345, the Supreme Court concluded that § 1983 suits by individuals against a state for money damages are barred by the Eleventh Amendment. *Id.* ("[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]").

However, a state may waive its Eleventh Amendment sovereign immunity and permit suit in federal court. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002); *see Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 249. But, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240 (1985), *superseded on other grounds, as recognized in Lane v. Pena*,

518 U.S. 187, 198 (1996); *see Pense*, 939 F.3d at 101.  Under *Atascadero*, 473 U.S. at 254, a court may find that a state has waived its Eleventh Amendment immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." (Internal quotation marks and alteration omitted); *accord Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 250-51.

And, under *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity does not extend to a request for prospective injunctive relief to correct an ongoing violation of law.  However, to avoid an Eleventh Amendment bar to suit on this basis, the complaint must be lodged against a state official, and it must "alleg[e] an ongoing violation of federal law and see[k] relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

## 2.  State sovereign immunity

The doctrine of sovereign immunity is "firmly embedded in the law of Maryland." *Katz v. Wash. Suburban Sanitary Comm'n*, 284 Md. 503, 512-13, 397 A.2d 1027, 1032-33 (1979); se*e Bd. of Educ. of Balt. Cty. v. Zimmer-Rubert*, 409 Md. 200, 240, 973 A.2d 233, 211 (2009); *Bd. of Howard Cmty College v. Rugg*, 278 Md. 580, 584, 366 A.2d 360, 362-63 (1976) (declining to abrogate sovereign immunity by judicial fiat); *Jekofsky v. State Roads Comm'n*, 264 Md. 471, 474, 287 A.2d 40, 41-42 (1972) (same).  And, like Eleventh Amendment immunity, State sovereign immunity "is applicable not only to the State itself, but also to its agencies and instrumentalities[.]" *Proctor v. Wash. Metro. Area Transit Auth*., 412 Md. 691, 709, 990 A.2d 1048, 1058 (2010) (quoting *Katz*, 284 Md. at 507-08, 397 A.2d at 1030); *see Clea v. Mayor & City Council of Balt*., 312 Md. 662, 669-70, 541 A.2d 1303, 1306-07 (1988); *Dep't of Public Safety and Corr. Servs v. ARA Health Servs, Inc*., 107 Md. App. 445, 456, 668 A.2d 960, 966 (1995), *aff'd*, 344 Md. 85, 685

A.2d 435 (1996). Therefore, unless the Maryland General Assembly has waived immunity, State sovereign immunity bars an individual from maintaining a suit for money damages against the State of Maryland or one of its agencies for violations of State law. *See State v. Sharefeldin*, 382 Md. 129, 140, 854 A.2d 1208, 1214 (2004); *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 306, 780 A.2d 410, 424 (2001) (citing *Catterton v. Coale*, 84 Md. App. 337, 345-46, 579 A.2d 781, 785 (1990)); *see also Samuels v. Tschechtelin*, 135 Md. App. 483, 522, 763 A.2d 209, 230 (2000).

### 3. Official capacity

The Amended Complaint specifies that suit is brought against the individual defendants in their official and individual capacities. ECF 13, ¶¶ 9-13.

As the Supreme Court explained in *Kentucky v. Graham*, 473 U.S. 159, 166 (1985), "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (Quoting *Monell*, 436 U.S. at 690, n.55); *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."); *Huggins v. Prince George's Cty.*, 683 F.3d 525, 532 (4th Cir. 2012) (treating a suit against individuals in their official capacities as a suit against the county). The *Graham* Court also said, 473 U.S. at 166: "As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." (Emphasis in *Graham*). Thus, official capacity claims are subject to the same immunities the employing entity itself enjoys, such as sovereign immunity under the Eleventh Amendment. *Graham*, 473 U.S. at 167; *accord Hafer v. Melo*, 502 U.S. 21, 25 (1991).

4.  Analysis

As indicated, State agencies enjoy immunity from suit brought in federal court.  *See Hans*, 134 U.S. at 3; *see also Garrett*, 531 U.S. at 363; *Bd. of Educ. of Prince George's Cty. v. Town of Riverdale*, 320 Md. 384, 389, 578 A.2d 207, 210 (1990).  However, sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'"  *Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting L*ake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)).  On the other hand, sovereign immunity applies when "'the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'"  *Lane v. Anderson*, 660 F. App'x 185, 195-96 (4th Cir. 2016) (internal quotations omitted) (quoting *Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)).

Thus, whether the BPD is immune as to plaintiff's *Monell* claim depends on whether the BPD is a State agency or a local one for purposes of the Eleventh Amendment.  To determine whether an entity is sufficiently connected to a state for purposes of immunity, the Fourth Circuit has directed courts to examine a nonexclusive list of four factors: (1) whether the state will pay a judgment against the defendant entity; (2) "'whether the entity exercises a significant degree of autonomy from the state,'" (3) "'whether the entity is involved with local versus statewide concerns,'" and (4) "'how the entity is treated as a matter of state law.'" *Lane*, 660 F. App'x at 195 (alterations omitted) (quoting *Ram Ditta*, 822 F.2d at 457-58).

The BPD argues that it is entitled to Eleventh Amendment immunity.  ECF 20-1 at 18-21.  It points out that, "[a]s a matter of long-standing Maryland law, BPD is an agency of the State of

Maryland, not the City of Baltimore." ECF 20-1 at 19 (citing P.L.L., Art. 4, § 16-2(a)). And, it relies on two recent decisions issued by this Court. *See Whetstone v. Mayor & City Council of Baltimore*, ELH-18-738, 2019 WL 1200555, at *12 (D. Md. Mar. 13, 2019); *McDougald v. Spinnato*, ELH-17-2898, 2019 WL 1226344, at *11 (D. Md. Mar. 15, 2019).[7]

To be sure, Maryland law recognizes the BPD as a State agency. *Mayor & City Council of Baltimore v. Clark*, 404 Md. 13, 23, 944 A.2d 1122, 1128 (2008) ("[T]he Baltimore Police Department is not an agency of the City of Baltimore and has not been for some time.") (citing Acts of 1860, ch. 7, § 14); *Clea v. Mayor & City Council of Baltimore*, 312 Md. 662, 669-70, 541 A.2d 1303, 1306-07 (1988). But, this Court erroneously indicated in *Whetstone* and *Spinnato* that the BPD enjoys Eleventh Amendment immunity.

The plaintiff in *Whetstone* filed a civil rights suit under 42 U.S.C. § 1983 against several defendants, including BPD. 2019 WL 1200555, at *1. In particular, she asserted a *Monell* claim against the BPD. *Id.* The BPD moved to dismiss under Rule 12(b)(6), for failure to state a claim. *Id.* at *11. This Court observed that the BPD is a State agency and thus immune to *Monell* actions. *Id.* at *12. Specifically, I said, *id.*: "In the first instance, the claim against the BPD is not viable under *Monell*, as the BPD has been a State agency, not a local agency, since 1867."

Similarly, in *Spinnato*, the plaintiff lodged several claims under 42 U.S.C. § 1983 against many defendants, including former BPD Commissioner Anthony W. Batts, individually and in his official capacity. 2019 WL 1226344, at *1. Batts moved to dismiss plaintiff's claims, including

---

[7] Defendants also cite to *Estate of Anderson v. Strohman*, 6 F. Supp. 3d 639, 645 (D. Md. 2014), to support their contention that the BPD is entitled to Eleventh Amendment Immunity. But, that reliance is misplaced. In that case, Judge Russell addressed whether the City could be held liable under § 1983 for constitutional violations committed by the BPD, not whether the BPD is immune from § 1983 claims. Thus, *Estate of Anderson* has little bearing on the issue presented here.

a *Monell* claim asserted against him in his official capacity, pursuant to Rule 12(b)(6), for failure

to state a claim. *Id.* at \*2. As Batts was sued in his official capacity, the Court regarded plaintiff's

*Monell* claim as a suit against the BPD. *Id.* at \*8. It said, *id.* at \*12:

> Under Maryland law, the BPD has been a State agency, not a local agency, since 1867. *See Mayor & City Council of Baltimore v. Clark*, 404 Md. 13, 23, 944 A.2d 1122, 1128 (2008); *Clea v. Mayor & City Council of Balt.*, 312 Md. 662, 669-70, 541 A.2d 1303, 1306-07 (1988). If the BPD is an arm of the State, it is not a municipality subject to suit under *Monell* . . . . Therefore, there is no basis for a *Monell* claim based on actions of the BPD.

However, defendants here place more weight on *Whetstone* and *Spinnato* than those cases

should bear. In both cases, after discussing sovereign immunity, the Court proceeded to examine

whether the plaintiff stated a plausible *Monell* claim. And, in both cases, I determined that the

factual allegations contained in the complaints were insufficient to support a *Monell* claim against

the BPD. *See Spinnato*, 1226344, at \*12; *Whetstone*, 2019 WL 1200555 at \*11. Therefore, because

my analysis regarding sovereign immunity was not outcome determinative, it was dicta.

Moreover, I recently declined to embrace those decisions. *See Burley v. Balt. Police Dep't*,

ELH-18-1743, 2019 WL 4325295 (D. Md. Sept. 12, 2019).[8] In *Burley*, the plaintiffs lodged claims

under federal and Maryland law against the BPD and officers of the BPD's now defunct Gun Trace

Task Force. *Id.* at \*1. The BPD moved, *inter alia*, to dismiss the plaintiffs' *Monell* claim, asserting

that it was barred by sovereign immunity. *Id.* at \*25. However, this Court rejected that argument,

concluding that the BPD was subject to suit under § 1983. *Id.* at \*29.[9]

---

[8] *Burley* has since been reassigned to Judge Stephanie Gallagher. Therefore, the current case number is SAG-18-1743.

[9] On September 17, 2019, the BPD filed an interlocutory appeal to the Fourth Circuit. *See Burely v. Balt. Police Dep't*, SAG-18-1743, ECF 53, 2019 WL 4325295 (D. Md. Sept. 12, 2019), *appeal filed*, No. 19-2029 (4th Cir.).

Similarly, in *Jones v. Chapman*, ELH-14-2627, 2015 WL 4509871, at *10 (D. Md. July 24, 2015), a § 1983 death case involving various members of the BPD, this Court said that sovereign immunity protects the BPD against State law claims but not against § 1983 claims. The Court explained that, for the purpose of § 1983, "'the BPD is too interconnected with the government of the City so as to constitute a State agency'" and thus the BPD is subject to suit under § 1983. *Id.* at *10 (quoting *Chin v. City of Balt.*, 241 F. Supp. 2d 546, 548 (D. Md. 2003)).

*Chin*, 241 F. Supp. 2d 546, is instructive. That case arose from an encounter between plaintiff Michael Chin and BPD police officers. *Id.* at 547. Several BPD police officers entered a store owned by Chin, with their weapons drawn. *Id.* The officers searched the premises without a warrant and "displayed no indicia that they were affiliated with law enforcement." *Id.* They subsequently assaulted Chin and "then handcuffed him for an extended period of time." *Id.* The search did not produce any contraband and, as a result of the search, the store sustained significant property damage. *Id.* Thereafter, Chin filed suit against one of the officers, the BPD, and the City of Baltimore, pursuant to 42 U.S.C. § 1983, for federal civil rights violations and for State common law and constitutional torts. *Id.*

Judge Blake considered, *inter alia*, "whether the Baltimore Police Department is a state agency for Eleventh Amendment purposes" and therefore entitled to immunity from § 1983 claims. *Id.* at 548. In connection with the plaintiff's § 1983 claims, Judge Blake determined that the BPD is "too interconnected with the government of the City" so as to constitute a State agency. *Id.* Therefore, she concluded that the BPD is a "person" subject to suit under § 1983. *Id.*

To my knowledge, the Fourth Circuit has not directly resolved whether the BPD enjoys immunity as to a § 1983 action. In *Wiley v. Mayor and City Council of Baltimore*, 48 F.3d 773 (4th Cir. 1996), for example, the Court assumed that in a § 1983 action the BPD "may be held

accountable[.]" *Id.* at 776. However, numerous decisions in this District have held that, in regard to a claim under § 1983, the BPD is not a State agency for the purpose of Eleventh Amendment immunity. *See Lucero v. Early*, GLR-13-1036, 2019 WL 4673448, at *4 (D. Md. Sept. 25, 2019) (Russell, J.); *Bumgardner v. Taylor*, RBD-18-1438, 2019 WL 1411059, at *5 (D. Md. Mar. 28, 2019) (Bennett, J.); *Fish v. Mayor of Baltimore*, CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018) (Blake, J.); *Humbert v. O'Malley*, WDQ-11-0440, 2011 WL 6019689, at *5 n.6 (D. Md. Nov. 29, 2011) (Quarles, Jr., J.); *Munyiri v. Haduch*, 585 F. Supp. 2d 670, 676 (D. Md. 2008) (Davis, J.); *Hector v. Weglein*, 558 F. Supp. 194, 197-99 (D. Md. 1982) (Kaufman J.).

Accordingly, the Eleventh Amendment does not compel the dismissal of plaintiff's *Monell* claims lodged against the BPD in Count I.

Plaintiff's State law claims against the BPD are a different matter. As noted, State law defines the BPD as a State agency. *See Clark*, 404 Md. at 23, 944 A.2d at 1128; *Clea*, 312 Md. at 669-70, 541 A.2d at 1306-07. The *Chin* Court explained, 241 F. Supp. 3d at 548-49.:

> However, with respect to the state law causes of action, the result is different. State sovereign immunity "protects the State not only from damage actions for ordinary torts but also from such actions for State constitutional torts." *Cherkes*, 780 A.2d at 424.[] The Baltimore Police Department enjoys sovereign immunity from actions for damages based on state common law torts or state constitutional torts. *See id.* at 422; 436.[] The claims against the Baltimore Police Department based on state law will, therefore, be dismissed on sovereign immunity grounds.

Accordingly, the BPD is immune as to plaintiff's State law pattern-and-practice claim, lodged in Count IV. Indeed, plaintiff acknowledges as much in the Opposition. ECF 25 at 16 n.3. Thus, I shall dismiss Count IV as to the BPD.[10]

---

[10] Maryland's Local Government Tort Claims Act, Md. Code (2013 Supp., 2018 Repl. Vol.), § § 5-301 et seq., is discussed, *infra*. As the BPD concedes (ECF 20-1 at 33), that statute waives the BPD's sovereign immunity as to the duty to defend and/or indemnify an employee under certain circumstances. *See* C.J. § 5-303(b)(2); *Cherkes*, 140 Md. App. at 323, 780 A.2d at 434; *see also Hansen v. City of Laurel*, 420 Md. 670, 678 n.5, 25 A.3d 122, 127 (2011).

Regarding former Commissioner Davis, a suit against him in his official capacity is tantamount to a suit against the BPD. *See Graham*, 473 U.S. at 166; *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). Because the BPD is entitled to State sovereign immunity, I shall dismiss Count IV as to Davis in his official capacity.[11]

Moreover, to the extent that Count I is lodged against Davis in his official capacity, it is redundant, because plaintiff has also sued the BPD. *See Graham*, 473 U.S. at 167 n.14 ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell* . . . local government units can be sued directly for damages and injunctive or declaratory relief."). Accordingly, I shall dismiss Count I as to Davis in his official capacity. *See Love-Lane*, 355 F.3d at 783 ("The district court correctly held that the § 1983 claim against [the defendant] in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative."); *Andrews v. Balt. City Police Dep't*, CCB-16-2010, 2018 WL 3649602 at *4 n.4 (D. Md. Aug. 1, 2019), *appeal filed*, No. 18-1953 (4th Cir.); *Corral v. Montgomery, Cty.*, 4 F. Supp. 3d 739, 748 (D. Md. 2014).

### D. Failure to State a Claim

1. Count I: *Monell* claim

In Count I, plaintiff brings a *Monell* claim against the BPD and Davis under two theories. First, she alleges that, at the time of the incident, the BPD "had in force and effect . . . a policy, practice or custom of condoning unlawful strip searches[.]" ECF 13, ¶ 50. Second, she alleges that the BPD and Davis "failed to adequately supervise, train or discipline" BPD police officers

---

[11] Plaintiff acknowledges that Davis is immune as to Count IV in his official capacity. ECF 25 at 16 n.3 But, plaintiff avers that Davis is liable in his personal capacity. *Id.* The BPD Motion does not address this argument in their reply. However, as discussed, *infra*, plaintiff's pattern-and-practice claim fails as a matter of law to the extent it is lodged against Davis in his individual capacity.

regarding proper stop and search procedures.  *Id.* ¶ 54.  The BPD and Davis have moved to dismiss Count I, asserting that the factual averments in the Amended Complaint fail to state a plausible *Monell* claim under either theory.  ECF 20-1 at 8-18, 24-30.

a.  *Monell* claim against Davis

As noted, Grim has sued Davis in both his official and personal capacity.  ECF 13, ¶ 10. As discussed, *supra*, I shall dismiss plaintiff's *Monell* claim (Count I), brought against Davis in his official capacity, as it is duplicative of her *Monell* claim against the BPD.  But, the question remains whether Davis may be sued under *Monell* in his personal capacity.  Neither side has addressed this issue.

A *Monell* claim is a cause of action that holds the "government as an entity . . . responsible under § 1983."  *Monell*, 436 U.S. at 694.  In contrast, "[p]ersonal-capacity suits seek to impose personal liability upon a government official[.]"  *Graham*, 473 U.S. at 165.  Therefore, "[a] victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him."  *Id.* at 167-68.  If *Monell* is limited to municipal entities and personal-capacity suits concern individuals, it follows that a *Monell* claim cannot lie against a municipal official sued in his individual capacity.  *See, e.g.*, *Devi v. Prince George's Cty.*, DKC-16-3790, 2017 WL 3592452 at *2 n.3 (D. Md. Aug. 21, 2017) (Plaintiff cannot state a *Monell* claim against an officer in his individual capacity.");  *Harasz v. Katz*, 239 F. Supp. 3d 461, 505 (D. Conn. 2017) ("'*Monell* does not apply to state officials or individuals sued in their individual capacity.'" (citation omitted)); MARTIN A. SCHWARTZ, SEC. 1983 LITIG. CLAIMS & DEFENSES § 7.01 (4th Ed. 2016) (explaining that *Monell* applies to municipal liability).

Therefore, I shall dismiss Count I to the extent it is lodged against Davis in his individual capacity.

b. Failure to train

Plaintiff alleges that the BPD failed to train BPD officers regarding proper frisk procedures "such that it was foreseeable that officers would conduct unlawful and unconstitutional strip searches." ECF 13, ¶ 52. In *Canton v. Harris*, 489 U.S. at 389, the Supreme Court said that "where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . . such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983."

Indeed, the manner in which a police force chooses to train its officers is "necessarily a matter of 'policy[.]'" *Spell*, 824 F.2d at 1389. Therefore, "the inadequacy of police training may serve as the basis for § 1983 liability," but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388.

When a plaintiff asserts a claim based on inadequate training, the "complaint should contain facts revealing: (1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the officer's conduct resulted from said training." *Lewis v. Simms*, AW-11-CV-2172, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (quoting *Drewry v. Stevenson*, WDQ-09-2340, 2010 WL 93268, at *4 (D. Md. Jan. 6, 2010)), *aff'd*, 582 F. App'x 180 (4th Cir. 2014). The *Connick* Court observed, 563 U.S. at 61: "To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." (Alteration in *Connick*); *see also Canton*, 489 U.S. at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Canton*, 489 U.S. at 389.

Notably, even if "a particular officer may be unsatisfactorily trained," that "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390-91. The *Canton* Court reasoned, *id.* at 391:

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Although the procedural posture of this case distinguishes it from *Connick v. Thompson*, 563 U.S. 51, *Connick* is pertinent, as it highlights the challenge a plaintiff faces when seeking to prevail on a failure to train claim. In *Connick*, the Court reiterated: "[P]rov[ing] that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice." *Id.* at 68 (alteration in *Connick*) (internal quotations omitted).

In *Connick*, respondent Thompson was prosecuted and convicted for attempted armed robbery and murder. *Id.* at 54. However, his convictions were overturned when it was discovered that the prosecution failed to disclose the existence of a certain crime lab report. *Id.* Based on the violation of *Brady v. Maryland*, 373 U.S. 83 (1963), Thompson filed a § 1983 suit against Harry Connick, in his official capacity as the Orleans Parish District Attorney. 563 U.S. 54. He alleged, *inter alia*, a "deliberate indifference to an obvious need to train prosecutors in his office to avoid such constitutional violations." *Id.* at 57. The district court ruled that, in order to establish deliberate indifference, Thompson was not required to show a pattern of similar *Brady* violations,

when he could demonstrate that the need for training was "'so obvious.'" *Id.* at 58. The jury found for Thompson and awarded him damages. *Id.* A divided Fifth Circuit affirmed. *Id.* at 57.

The Supreme Court considered whether a "district attorney's office [could be] held liable under § 1983 for failure to train its prosecutors based on a single *Brady* violation." *Id.* at 54. The Court noted that the *Canton* Court "sought not to foreclose the possibility . . . that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64. Nevertheless, the Court said, *id.* at 61:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' "is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

The case of *Peters v. City of Mount Rainier*, GJH-14-00955, 2014 WL 4855032 (D. Md. Sept. 29, 2014), provides guidance. In that case, the plaintiff lodged a § 1983 claim for failure to train the police force. *Id.* at *5. The complaint stated, *id.* (alteration in *Peters*) (quoting the complaint):

> [T]he City maintained an "official policy" of . . . "fail[ing] to properly train and supervise its officers; fail[ing] to implement effective procedures for investigating allegations of police misconduct; fail[ing] to discipline officers who violate the Constitutional rights of private citizens through false arrests, malicious prosecutions, and brutal conduct; and generally fail[ing] to provide safeguards against Constitutional abuses by its overzealous officers."

In considering whether to dismiss the failure to train claim, Judge Hazel highlighted the complaint's failure to allege facts concerning the "'nature of the training'" or "'that the officer's conduct resulted from said training.'" *Id.* at *5 (quoting *Lewis*, 2012 WL 254024, at *1). He

noted: "Peters has not even attempted to allege any such facts; instead, he has simply stated in broad, conclusory terms and in a variety of different ways that the City failed to train and supervise its officers." *Id.* (citation to the record omitted). Emphasizing this deficiency, Judge Hazel concluded that the plaintiff's allegation was "nothing more than a bare-bones generalization that a legal element (i.e. the policy[-]or-custom element) is met. Without more, Peters has failed to adequately allege the existence of a policy or custom through the City's purported failure to train its officers." *Id.*

And, *Hall v. Fabrizio*, JKB-12-754, 2012 WL 2905293 (D. Md. July 13, 2012), is instructive. There, Judge Bredar dismissed a failure to train claim against the Baltimore Police Department because "the complaint [did] not allege any facts regarding the sort of training that Baltimore police officers actually receive or how that training reflects the decision of any municipal policymaker." *Id.* at *2.

In view of *Canton*, *Connick*, *Hall*, and *Peters*, among other cases, it is clear that stating a claim for failure to train requires more than bald assertions that police officers were not properly trained. Here, plaintiff alleges that the BPD failed properly to train officers, but she does not identify any particular BPD training practices or any specific defect or omission in the BPD training program. She alleges summarily that the BPD "failed to adequately . . . train" BPD officers and that "it was foreseeable that constitutional violations and harm of the type in Ms. Grimes case would be the likely result of such [a] failure[]." *Id.* ¶ 52. These allegations cannot sustain a plausible *Monell* claim.

Because plaintiff fails plausibly to allege that training deficiencies on the part of the BPD caused the constitutional injuries she alleges, the portion of Count I concerning inadequate training shall be dismissed, without prejudice.

### c. A policy or custom of condonation

Under the condonation theory of liability, "a city violates § 1983 if municipal policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389). To assert a plausible claim, a plaintiff must allege "a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1386-1391). Both "knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Owens*, 767 F.3d at 402-03 (quoting *Spell*, 824 F.2d at 1391). However, only "'widespread or flagrant'" misconduct is sufficient. *Owens*, 767 F.3d at 403 (quoting *Spell*, 824 F.2d at 1387). In contrast, "[s]poradic or isolated" misconduct is not. *Owens*, 767 F.3d at 403.

Notably, the Fourth Circuit has explained that "[a]lthough prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier." *Id. Owens*, 767 F.3d 379, is illustrative. There, Owens brought a § 1983 claim against the BPD, several BPD officers, the Baltimore City State's Attorney's Office, and an assistant State's Attorney, alleging, *inter alia*, that the BPD "'maintained a custom, policy, and/or practice' of condoning its officers' conduct in 'knowingly, consciously, and repeatedly with[holding] and suppress[ing]' exculpatory evidence." *Id.* at 402 (quoting the complaint). The district court granted the defendants' motion to dismiss and Owens appealed.

The Fourth Circuit reversed. *Id.* at 404. As relevant here, the Fourth Circuit scrutinized Owens's complaint to determine whether it alleged a plausible condonation claim. The Court observed, *id.* at 403 (alterations in original):

In support of his claim, Owens alleges that "[r]eported and unreported cases from the period of time before and during the events complained of" establish that the BCPD had a custom, policy, or practice of knowingly and repeatedly suppressing exculpatory evidence in criminal prosecutions. He further alleges that "a number of motions were filed and granted during this time period that demonstrate that [the BCPD] maintained a custom, policy, or practice to allow this type of behavior either directly or . . . by condoning it, and/or knowingly turning a blind eye to it."

According to the Court, "[t]he assertions as to 'reported and unreported cases' and numerous 'successful motions' are factual allegations, the veracity of which could plausibly support a *Monell* claim." *Id.* Further, Owens's allegation that the BPD officers withheld exculpatory information "on multiple occasions could establish a 'persistent and widespread' pattern of practice, the hallmark of an impermissible custom." *Id.* (quoting *Spell*, 824 F.2d at 1386). Thus, the Court ruled that the complaint contained sufficient allegations to support a *Monell* claim premised on a condonation theory of liability. *Id.* at 404.

A similar result was reached in *Garcia v. Montgomery Cty.*, Md., JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013). There, Garcia, his wife, and a family friend were leaving a restaurant when Garcia observed two young men being arrested by the Montgomery County Police ("MCP"). *Id.* at *1. Concerned that the arresting officers were using excessive force, Garcia, "an award-winning freelance photojournalist," began to photograph the incident from at least thirty feet away. *Id.* One of the officers flashed Garcia with a spotlight, and he moved across the street to continue photographing the incident from a distance of about one hundred feet. *Id.*

Garcia was then approached by an officer. Garcia identified himself as a member of the press, and opened his hands to show that he had nothing in his possession except his camera. *Id.* The officer "shouted that Mr. Garcia was under arrest, placed him in a chokehold, and forcibly dragged him along the ground to the police cruiser." *Id.* Subsequently, the officer "placed Mr. Garcia in handcuffs and confiscated his camera." *Id.* The officer then "kicked Mr. Garcia's right

foot out from under him, causing Mr. Garcia to hit his head on the police cruiser as he fell to the ground." *Id.* Garcia was subsequently taken into custody and charged with disorderly conduct. *Id.* At a trial in a Maryland court, Garcia was acquitted of disorderly conduct. *Id.*

Thereafter, Garcia filed suit against the County and, among other counts, he lodged a *Monell* claim. Garcia's complaint stated "that his injury resulted from 'Montgomery County's policy or custom of indifference to misconduct by [MCP] officers' and a 'lack of training and supervision requiring the police to follow the law and established departmental policies.'" *Id.* at *5 (quoting the complaint). Further, Garcia alleged that, despite a written media relations policy, which provides that police should maintain a cooperative working relationship with members of the media, there is a "'custom and practice among [MCP] officers of obstructing and/or preventing members of the media from filming police activity conducted in public.'" *Id.* (quoting the complaint). He also complained that Montgomery County has a policy, custom, or practice of "'failing to supervise and discipline officers who unlawfully obstruct and/or prevent members of the media and the public from recording police activity conducted in public view, despite its awareness that these violations happen.'" *Id.* (quoting the complaint). According to Garcia, Montgomery County effectively sanctioned and endorsed his treatment by the police because of its inadequate investigation of the incident. *Id.*

The defense moved to dismiss, asserting: "Mr. Garcia's complaint mentions only his incident and . . . he has pled nothing more than an isolated constitutional deprivation . . . ." *Id.* at *5. Judge Motz rejected that argument, reasoning, *id.*:

> Mr. Garcia has stated a valid *Monell* claim. Contrary to the defendants' assertion that Mr. Garcia's complaint mentions only his incident and that he has pled nothing more than an isolated constitutional deprivation, the complaint alleges that Montgomery County was aware of unconstitutional actions by MCPD officers directed towards members of the media but chose to ignore such behavior. The Fourth Circuit has made clear that a *Monell* plaintiff need not "plead the multiple

incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 339-40 (4th Cir. 1994) (citations omitted).

Judge Motz concluded: "At this stage, it is enough that Mr. Garcia has alleged that Montgomery County was aware of ongoing constitutional violations by [MCP] officers and that the county's failure to supervise and discipline its officers allowed a pattern and/or practice of unconstitutional actions to develop." *Id.* Judge Motz added, *id.*:

> Under *Twombly* and *Iqbal*, the factual allegations in the complaint are sufficient to survive a motion to dismiss as they are "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Jordan*, 15 F.3d at 338 (stating that "section 1983 claims are not subject to a 'heightened pleading standard' paralleling the rigors of proof demanded on the merits") (citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)).

The BPD insists that the Amended Complaint is "devoid of facts supporting [a] § 1983 *Monell* claim." ECF 20-1 at 14. In particular, it contends that the DOJ Report of August 2016 cannot serve as the basis for plaintiff's *Monell* claims because it is "unsubstantiated." *Id.* at 29. And, the BPD maintains that the DOJ Report is inapposite because it was published after Officer Paul allegedly assaulted plaintiff and therefore "could not have served as pre-constitutional deprivation notice to the BPD[.]" *Id.* at 18.

These arguments are without merit. The veracity of the DOJ Report is immaterial at this juncture, where the Court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (4th Cir. 2011); *see Jones v. Jordan*, GLR-16-2662, 2017 WL 4122795, at *9 (D. Md. Sept. 18, 2017) (finding allegations premised on the DOJ Report were sufficient to plead that the BPD was aware of police officers' ongoing constitutional violations). Likewise, the timing of the DOJ Report's issuance is besides the point. Plaintiff does

not allege that the DOJ Report put BPD on notice of the department-wide practice of performing unconstitutional strip searches. Rather, plaintiff alleges that the findings contained in the DOJ Report establish that the BPD had notice of this issue as early as 2011.

Careful review of the Amended Complaint demonstrates that it adequately alleges the existence of a "policy, practice, or custom of condoning unlawful strip searches[.]" ECF 13, ¶ 50. Plaintiff asserts that, "[s]ince at least 2011," unlawful strip searches were a "widespread and flagrant" practice among BPD officers such that the BPD had notice of the problem. *Id.* ¶ 53. In support of this averment, plaintiff maintains that between 2011 and 2016, the BPD received "more than 60 complaints of unlawful strip searches." *Id.* ¶ 39. Plaintiff also alleges three incidents of allegedly unlawful strip searches to bolster her allegation that the BPD was deliberately indifferent to these constitutional violations. *Id.* ¶¶ 39-41. Specifically, the Amended Complaint states:

(1) "'[O]fficers in BPD's Eastern District publicly strip-searched a woman following a routine traffic stop for a missing headlight. Officers ordered the woman to exit her vehicle, remove her clothes, and stand on the sidewalk to be searched. The woman asked the male officer in charge, 'I really gotta take all my clothes off?' The male officer replied 'yeah' and ordered a female officer to strip search the woman. The female officer then put on purple latex gloves, pulled up the woman's shirt and searched around her bra. Finding no weapons or contraband around the woman's chest, the officer then pulled down the woman's underwear and searched her anal cavity. This search again found no evidence of wrongdoing and the officers released the woman without charges. Indeed, the woman received only a repair order for her headlight. The search occurred in full view of the street[.]'" *Id.* ¶ 39.

(2) "'[I]n September 2014, a man filed a complaint stating that an officer in the Central District searched him several days in a row, including 'undoing his pants' and searching his 'hindquarters' on a public street. When the strip search did not find contraband, the officer told the man to leave the area and warned that the officer would search him again every time he returned.'" *Id.* ¶ 40.

(3) "[I]n 2015 an African American man filed a complaint that he was strip-searched by an officer whom the BPD eventually fired in 2016 after numerous allegations of misconduct. The man stated that the officer ordered him out of his vehicle during a traffic stop and searched the vehicle without the man's consent. When the stop of the vehicle did not uncover any contraband, the

officer pulled down the man's pants and underwear, exposing his genitalia on the side of a public street, and then strip-searched him. The officer seized marijuana and cash during the strip search and allegedly told the man that the officer would return his money and drugs if the man provided information about more serious crimes." *Id.* ¶ 41.

Furthermore, plaintiff alleges that BPD failed to address the scourge of unconstitutional strip searches. For example, the Amended Complaint states that of the 60 complaints involving strip searches that BPD received between 2011 and 2016, only one resulted in disciplinary action. *Id.* ¶¶ 39, 41. As for the other 59, plaintiff alleges, quoting the DOJ Report, that the BPD "'deemed them administratively closed, classified them solely for administrative tracking, or found them not sustained.'" *Id.* (internal quotation marks omitted). Accepting these allegations as true, as I must at this stage, plaintiff has more than adequately alleged that the BPD turned a blind eye to its officers performing strip searches, thereby tacitly approving the practice.

Accordingly, I will deny the BPD Motion as to the condonation claim lodged in Count I.

### 2. Count II: Supervisory liability

Grim has sued Davis and the Unknown Supervisors in their official and personal capacities, alleging that they had "oversight responsibility for training, hiring, screening, instruct[ing], supervis[ing] and discipline[ing]" Officer Paul, ECF 13, ¶ 57; "knew or should have known" that Officer Paul "was conducting unlawful strip searches of suspects," *id.* ¶ 58; and "were personally involved in failing to take necessary remedial and preventive actions and measures to protect against such constitutional violations[.]" *Id.* ¶ 61.

The Fourth Circuit has stated: "A supervisor can only be held liable for the failings of a subordinate under certain narrow circumstances." *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013); *see Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) ("[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates.").

Specifically, a supervisor's "continued inaction in the face of documented widespread abuses . . . provides an independent basis" for § 1983 liability against that official for his or her deliberate indifference or acquiescence to "the constitutionally offensive conduct of his subordinates." *Slakan*, 737 F.2d at 373.

That said, public officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." *Iqbal*, 556 U.S. at 676; *see Monell*, 436 U.S. at 691; *Love-Lane*, 355 F.3d at 782 (finding no respondeat superior liability under § 1983); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (finding no respondeat superior liability in a *Bivens* suit). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

To state a claim for supervisory liability under § 1983, a plaintiff must allege: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to the knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted); *see also Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014). In other words, the liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed

to their care." *Baynard* v. *Malone,* 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan*, 737 F.2d at 372).

Regarding the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm" requires allegations that "the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Shaw*, 13 F.3d at 799 (quoting *Slakan*, 737 F.2d at 373-74); *see Wilkins*, 751 F.3d at 226. As to the second element, the plaintiff adequately alleges that a supervisor was deliberately indifferent by alleging facts "'demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" *Wilkins*, 751 F.3d at 226 (quoting *Shaw*, 13 F.3d at 799). And, with respect to the third element, "'proof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains . . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions.'" *Wilkins*, 751 F.3d at 226-27 (quoting *Shaw*, 13 F.3d at 799).

Two cases illuminate the line between a merely conceivable claim of supervisory liability and a plausible one. In *Lee v. Queen Anne's County Office of The Sheriff*, RDB-13-672, 2014 WL 476233 (D. Md. Feb. 5, 2014), a warrant was issued for Lee's arrest based on a police report stating that he had driven through a stop sign. *Id.* at *1. Upon learning of the warrant, Lee surrendered to law enforcement and was "briefly incarcerated before being released on bond that same day." *Id.* At trial, Lee maintained that he was not driving the car and that the car did not drive through a stop sign. *Id.* He was convicted of fraud, failure to stop, and driving with a revoked license. *Id.* However, a subsequent investigation revealed dashboard camera video evidence suggesting that the deputy who had written the police report and testified at Lee's trial lied about the stop. *Id.*

at *2. Moreover, the prosecutor purportedly concluded that, based on the evidence, there was no probable cause for the traffic stop. As a result, the "charges" were subsequently *nol prossed. Id.*

Thereafter, Lee filed suit against the Queen Anne's County Office of the Sheriff. He alleged that the deputy's actions were "undertaken with malice and that he has suffered mental anguish, emotional pain and suffering, and financial loss as a result." *Id.* at *2. Further, Lee contended that the deputy "'acted with a wanton and reckless disregard for Plaintiff's civil rights by conducting an illegal traffic stop, causing an improper warrant to issue, [and] harassing Plaintiff and his family during a two-month period[.]'" *Id.* at *17 (quoting the amended complaint). And, pursuant to a theory of supervisory liability under § 1983, plaintiff sought to hold the Sheriff liable for the deputy's conduct. *Id.* at *8.

Lee alleged that the Sheriff "had constructive knowledge of his deputies' unconstitutional conduct" based on three incidents of prior conduct. *Id.* at *9 (quoting the amended complaint):

a. On May 12, 2011, Queen Anne's County deputy John Dennis Hofmann pled guilty to second-degree assault after groping a woman inside his patrol car in August 2009. Deputy Hofmann is the brother of the Queen Anne's County Sheriff, Gary Hofmann. Hofmann remains employed by the Queen Anne's Office of the Sheriff[.]

b. In August 2007, the Queen Anne's County Office of the Sheriff suspended three deputies for misconduct that occurred during a traffic stop. The misconduct concerned violations of departmental policies and procedures having to do with vehicle searches. After the investigation, all three deputies were reinstated even though two deputies had been found to have violated policies and procedures.

c. On March 17, 2004, Queen Anne's County Deputy Sheriff Mark Barbre shot and paralyzed Andrew Pope, III during a traffic stop. Deputy Barbre had signaled for Pope to stop and pull over, but Pope continued to drive his vehicle until he reached his house, where he exited his vehicle and raised his hands in surrender. Deputy Barbre shot his firearm at Pope, striking him in the neck, paralyzing him.

Based on these facts, the plaintiff insisted "that these allegations are sufficient to support his claim that [the Sheriff] had constructive knowledge of his deputies' unconstitutional conduct"

and acted with deliberate indifference. *Id.* Urging dismissal, the Sheriff argued that plaintiff relied too heavily on conclusory statements and lacked adequate factual detail to state a claim for supervisory liability. *Id.* at *8.

In effect, the question before the court was whether the suit "contain[ed] sufficient examples of past occurrences to state a valid claim and avoid dismissal at this early stage of the litigation." *Id.* at *9. The court noted that "the specific instances of misconduct adequately supplement that claim and demonstrate the requisite constructive knowledge and deliberate indifference." *Id.* In particular, it said, *id.*: "The 2007 event pertaining to the traffic stop clearly raises potential Fourth Amendment issues." And, the court said: "The 2009 and 2007 incidents, as alleged, also suggest that the Sheriff's Office—and Sheriff Hofmann in particular—have failed to properly supervise and discipline the deputies because the deputies allegedly remained a part of the Sheriff's Office despite their misconduct." *Id.* Thus, the *Lee* Court found that, although the allegations "present[ed] a close case," it ruled that the plaintiff adequately pleaded a claim for § 1983 supervisory liability. *Id.* at *9 n.19.

Of import here, the court acknowledged that none of the allegations related to the deputy whom Lee alleged engaged in unconstitutional conduct. *Id.* But, the court found that this was of no moment, observing that "the Fourth Circuit has never held that the 'widespread' or 'pervasive' wrongdoing must originate from the same source" as that which caused the plaintiff's constitutional injury. *Id.*

The case of *Jones v. Chapman*, ELH-14-2627, 2015 WL 4509871 (D. Md. July 24, 2015), serves as a helpful contrast. The suit arose from the unfortunate death of Tyrone West during a traffic stop in Baltimore City. This Court considered, in the context of a motion to dismiss, plaintiffs' attempt to establish supervisory liability on the basis of general averments that a

supervisor failed to respond to prior constitutional violations committed by members of the BPD. The suit said, *id.* at *5:

> It has been widely reported in the community, by news media, about the activities and excessive force allegations against members of the BPD, including specific Defendant BPD Officer Defendants in this suit. Some resulting in settlements and awards. The [C]ommissioner is either aware of or should have been aware of these matters, and, therefore, has actual or constructive knowledge that some of his BPD officers were engaged in conduct posing a pervasive and unreasonable risk of actual harm and constitutional deprivation to citizens such as Tyrone West[.]

(Quoting the complaint).  The complaint also recounted "three other police-citizen encounters (out of thousands of arrests annually) in Baltimore City," allegedly involving the use of excessive force by BPD officers. *Id.* at *24-26.

However, after close scrutiny of the complaint in *Jones*, I determined that the plaintiff failed to allege facts to show that former BPD Commissioner Batts was deliberately indifferent to a pervasive and unreasonable risk of unconstitutional action by the BPD.  The plaintiff's conclusory assertion that Batts should have known about the unconstitutional conduct of "some of his BPD officers" was insufficient by itself to state a claim for the personal liability of Batts.  *Id.* at *24.  The three examples of misconduct included in the complaint were equally unavailing.  One of the three encounters had occurred before Batts's appointment as BPD Commissioner, one contained insufficient detail to permit the Court to assess whether it suggested that Batts had knowledge of prior constitutional abuses, and the last had occurred just days before the incident involving Mr. West, such that no conclusion about Batts's action or inaction with respect to the incident could be drawn.  *Id.*

Here, plaintiff has not pleaded allegations adequate to nudge her claim for supervisory liability into plausible territory.  As already recounted, plaintiff alleges three examples of strip searches by BPD officers in an effort to demonstrate that Davis exhibited "continued inaction in

the face of documented widespread abuses." *Randall*, 302 F.3d at 206 (internal quotations omitted). But, it is unclear from the suit whether Davis was the BPD Commissioner at the time of the incidents of unlawful strip searches alleged in the Amended Complaint.

The first incident describes a woman who was "publicly strip-searched" in BPD's "Eastern District" during a routine traffic stop. ECF 13, ¶ 39. No approximate date is given for this search. The second search recounted in the Amended Complaint allegedly occurred in September 2014. *Id.* ¶ 40. The third strip search happened sometime in 2015. *Id.* ¶ 41. Davis served as BPD Commissioner from July 8, 2015, to January 19, 2018. Thus, all three incidents may have occurred before Davis began his tenure as Commissioner. Given this uncertainty, I cannot draw an inference of continued inaction on the part of Davis, nor is there an alleged "affirmative causal link" between Davis's alleged inaction and plaintiff's alleged constitutional injury. *Shaw*, 13 F.3d at 799; *see Holloman v. Rawlings-Blake*, CCB-14-1516, 2014 WL 7146974 at *5 (D. Md. Dec. 12, 2014) (dismissing supervisory liability claim where alleged incident occurred before defendant became BPD Commissioner), *aff'd sub nom.*, *Holloman v. Markowski*, 661 F. App'x 797 (4th Cir. 2016), *cert. denied*, ___ U.S. ___, 137 S. Ct. 1342 (2017).

Accordingly, I shall dismiss Count II, without prejudice, as against Davis.

### 3. Count IV: Pattern-and-practice claim

In Count IV, plaintiff sued the BPD and Davis based on "pattern and practice." As discussed, State sovereign immunity forecloses plaintiff from pursuing a pattern-and-practice claim lodged under State law against the BPD and Davis in his official capacity.

Plaintiff acknowledges that the BPD is immune from Count IV and that Davis is also immune to the extent he is sued in his official capacity. ECF 25 at 16 n.3. But, plaintiff avers that "Davis, in his personal capacity, should remain as a Defendant" under Count IV. *Id.* The BPD

Motion does not respond to this argument. Nor has Davis moved to dismiss the claim against him in his personal capacity.

Notwithstanding the failure of the BPD and Davis to address this issue, a district court may dismiss a claim sua sponte for failure to state a plausible claim for relief. *Cutonilli v. Maryland*, 251 F. Supp. 3d 920, 924 (D. Md.), *aff'd*, 696 F. App'x 648 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 456 (2017); *Sheehan v. Saoud*, 650 F. App'x. 143, 152-53 (4th Cir. 2016) (collecting cases); *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 655 n.10 (4th Cir. 2006); *Nix v. NASA Fed. Credit Union*, 200 F. Supp. 3d 578, 586 (D. Md. 2016); 10A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (4th ed. 2019) ("Even if a party does not make a formal motion under Rule 12(b)(6), the district judge on his or her own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair to the parties. Since the motion to dismiss . . . raises only an issue of law, the court has no discretion as to whether to dismiss a complaint that it determines is formally or substantively insufficient.").

In the case of *Prince George's Cty. v. Longtin*, 419 Md. 450, 19 A.3d 859 (2011), the Maryland Court of Appeals explained that Article 24 of the Maryland Declaration of Rights "provides protection to individuals against unconstitutional 'pattern and practices' of municipalities." *Id.* at 496, 19 A.3d at 887. Thus, "Maryland, like the federal government, imposes liability on municipalities for widespread patterns or practices that cause constitutional injuries." *McMahon v. Cty. Comm'rs of Kent Cty.*, JFM-13-490, 2013 WL 2285378, at *4 n.6 (D. Md. May 21, 2013).

"'*Longtin* claims are essentially Maryland's version of *Monell* claims.'" *Devi*, 2017 WL 3592452, at *4 (quoting *Rosa v. Bd. of Educ.*, AW-11-02873, 2012 WL 3715331, at *9 (D. Md. Aug. 27, 2012)). To be sure, *Longtin* and *Monell* are not identical. Notably, Maryland law imposes

respondeat superior liability on municipalities for the State constitutional violations of its employees. *See Longtin*, 419 Md. at 494-96, 19 A.3d at 886-87; *DiPino v. Davis*, 354 Md. 18, 51, 729 A.2d 354, 372 (1999). However, *Longtin*, like *Monell*, "creates liability upon the municipality for unconstitutional actions of its employees, *not* liability upon the individual employee." *Devi*, 2017 WL 3592452, at *4 (emphasis added). For this reason, courts in this District have held that a plaintiff cannot lodge a *Longtin* claim against an individual defendant in his individual capacity. *See Devi*, 2017 WL 3592452, at *4; *Lee*, 2014 WL 476233, at *17 (dismissing, with prejudice, *Longtin* claim lodged against individual defendants); *McMahon*, 2013 WL 2285378, at *4 n.6.

Accordingly, plaintiff's pattern-and-practice claim fails as a matter of law to the extent it is lodged against Davis in his individual capacity.

#### 4. Count VII: Indemnification claim

In Count VII, plaintiff seeks "indemnification" against the BPD and the City. ECF 13 at 16-17. Plaintiff alleges that "Defendant Paul is or was an employee of the BPD, who acted within the scope of his employment in committing the misconduct" set forth in the Amended Complaint. *Id.* ¶ 95. And, according to plaintiff, there is a "Memorandum of Understanding in place between Defendant Paul and Defendants BPD and City requiring Defendants BPD and City to indemnify Defendant Paul for judgements [sic] arising from acts committed within the scope of his employment." *Id.* ¶ 94. Both the City and the BPD have moved to dismiss Count VII. ECF 19-1 at 15-19; ECF 20-1 at 33-34.

In Maryland, the civil liability of local governments and their employees is limited by the Local Government Tort Claims Act ("LGTCA"), Md. Code (2013 Repl. Vol., 2018 Supp.), §§ 5-301 *et seq.* of the Courts and Judicial Proceedings Article ("C.J."). Under the LGTCA, "a local government shall be liable for any judgment against its employee for damages resulting from

tortious acts or omissions committed by the employee within the scope of employment with the local government." *Johnson v. Francis*, 239 Md. App. 530, 550, 197 A.3d 582, 594 (2018). Thus, the LGTCA "provide[s] 'a remedy for those injured by local government officers and employees, acting without malice in the scope of their employment, while ensuring that the financial burden of compensation is carried by the local government ultimately responsible for the public officials' acts.'" *Rios v. Montgomery Cty.*, 157 Md. App. 462, 475-76, 852 A.2d 1005, 1012 (2004) (quoting *Ashton v. Brown*, 339 Md. 70, 108, 660 A.2d 447, 466 (1995)), *aff'd*, 386 Md. 104, 872 A.2d 1 (2005).

The statute provides, in pertinent part, C.J. § 5-303(b):

(1) [A] local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.

(2) A local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection.

Thus, "an entity that is designated a local government under the LGTCA, and has available the common law defense of governmental or sovereign immunity, can no longer raise that defense to escape the statutorily imposed duties to defend and indemnify." *Cherkes*, 140 Md. App. at 323, 780 A.2d at 434. However, the LGTCA does not create a direct cause of action to sue a local government entity. *Id.* at 319 (citing *Williams v. Prince George's Cty.*, 112 Md. App. 526, 552, 685 A.2d 884 (1996)).

Of import here, the BPD is included in the list of "local governments" covered by the LGTCA. C.J. § 301(d)(21). However, "by adding the [BPD] to the list of local governments in the [LGTCA] . . . the General Assembly waived [BPD's] common law State sovereign immunity only to the extent of the statutory duties to defend and indemnify. Otherwise, the [BPD's] State sovereign immunity remain[s] intact." *Cherkes*, 140 Md. App. at 323, 780 A.2d at 434.

The City avers that Count VII fails to state a claim for indemnification against the City "because the City is not the employer of Def. Paul[.]" ECF 19-1 at 15. The City is correct. It is well settled that "Baltimore police officers are state employees free from the City's supervision and control." *Estate of Anderson v. Strohman*, 6 F. Supp. 3d 639, 646 (D. Md. 2014); *see Clark*, 404 Md. at 23, 944 A.2d at 1128; *Clea*, 312 Md. at 669-70, 541 A.2d at 1306-07. Indeed, the City does not implement policy for the BPD. *See* BALT. CITY CHARTER, Art II, § 27 ("[N]o ordinance of the City or Act of any municipal officer shall conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner."); *Cherkes*, 140 Md. App. at 312, 780 A.2d at 427-28. For these reasons, "the City does not sufficiently control the BPD to be responsible for Baltimore police officer conduct under § 1983[.]" *Estate of Anderson*, 6 F. Supp. 3d at 644; *see also Fish*, 2018 WL 348111, at *3 ("This court repeatedly has found the City is not responsible for officer conduct under § 1983 because BPD officers are not employees of the City as a matter of law."); *Bradley v. Balt. Police Dep't*, 887 F. Supp. 2d 642, 646-48 (D. Md. 2012).

In sum, because the City is not liable for a BPD officer's conduct, it has no obligation to indemnify Officer Paul for any monetary judgment plaintiff obtains against him. S*ee Johnson v. Mayor & City Council of Balt.*, 233 Md. App. 43, 54-55, 161 a.3d 95, 101-02 (2017) (holding that the LGTCA does not require the City to indemnify judgments entered against a BPD officer); *see also Houghton v. Forrest*, 412 Md. 578, 591-92, 989 A.2d 223, 231-32 (2010) (holding that the LGTCA ensures that the BPD is liable for its officer's actions). Accordingly, Count VII is dismissed as to the City.

The BPD also moves to dismiss Count VII, arguing: "Plaintiff has not obtained a judgment against Def. Paul; nor has it been contested here (let alone established) whether Def. Paul was

acting within the scope of his employment." ECF 19-1 at 18. In response, plaintiff asks the Court to stay Count VII, pending the resolution of her claims against Officer Paul. ECF 25 at 17-18.

In my view, the indemnification claim is premature, because plaintiff has not yet obtained judgment against the individual defendants. *Jones v. Ziegler*, 894 F. Supp. 880, 897 (D. Md. 1995) (dismissing indemnification claim against county for torts committed by police officer as "premature" because judgment had not yet been entered). However, a stay of the claim, as requested by plaintiff, appears reasonable.

### III.  Motion for Default Judgment

### A.  Standard of Review: Rule 55

Rule 55 of the Federal Rules of Civil procedure provides a two-step procedure for obtaining a default judgment. First, under Rule 55(a), "the clerk must enter the party's default" upon the plaintiff's request. *See Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981); *Teamsters Local 639-Emp'rs Health Trust v. Boiler and Furnace Cleaners, Inc.*, 571 F. Supp. 2d 101, 106 (D.D.C. 2008); WRIGHT & MILLER, § 2682 ("Prior to obtaining a default judgment under either Rule 55(b)(1) or Rule 55(b)(2), there must be an entry of default as provided by Rule 55(a).").

Second, the plaintiff must move for a default judgment, which is governed by Rule 55(b). Fed. R. Civ. P. 55(b). Rule 55(b)(1) provides that the clerk may enter a default judgment if the plaintiff's claim is "for a sum certain or a sum that can be made certain by computation."[12] But, "[a] plaintiff's assertion of a sum in a complaint does not make the sum 'certain' unless the plaintiff claims liquidated damages; otherwise the complaint must be supported by affidavit or

---

[12] If the sum is not certain or ascertainable through computation, the court looks to Rule 55(b)(2).

documentary evidence." *Monge v. Portofino Ristorante*, 751 F. Supp. 789, 794 (D. Md. 2010) (Grimm, M.J.).[13]

To be sure, the United States Court of Appeals for the Fourth Circuit has a "strong policy that cases be decided on the merits." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993); *see Tazco, Inc. v. Director, Office of Workers' Compensation Program,* 895 F. 2d 949, 950 (4th Cir. 1990). But, that policy is not absolute. Default judgment "'is appropriate when the "adversary process has been halted because of an essentially unresponsive party.'" *Entrepreneur Media, Inc. v. JMD Entm't Grp., LLC*, 958 F. Supp. 2d 588, 593 (D. Md. 2013) (quoting *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005)).

Upon the entry of default against a party, the court must determine whether the undisputed factual allegations constitute a legitimate cause of action. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780-81 (4th Cir. 2001); *see also* Wright & Miller, § 2688.1 ("[L]iability is not deemed established simply because of the default . . . and the court, in its discretion, may require some proof of the facts that must be established in order to determine liability."). If the court is satisfied that liability has been established, it must then determine the appropriate amount of damages. *Ryan*, 253 F.3d at 780-81.

Allegations "relating to the amount of damages" are not deemed admitted based on a defendant's failure to respond to a suit, however. Fed R. Civ. P. 8(b)(6); *see Ryan*, 253 F.3d at 780 ("'[D]efault is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover.'") (citation omitted); *Monge*, 751 Supp. 2d at 794; *Trs. of the Elec. Welfare Trust Fund v. MH Passa Elec. Contracting, Inc.*, DKC-08-2805, 2009 WL 2982951, at

---

[13] Judge Grimm now serves as a United States District Judge. He authored *Monge* when he was a United States Magistrate Judge.

*1 (D. Md. Sept. 14, 2009) ("Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not.").  Rather, the court must make an independent determination regarding allegations as to damages.  *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999). In so doing, the court may conduct an evidentiary hearing. Fed. R. Civ. P. 55(b)(2).  However, the court may also make a determination of damages without a hearing, so long as there is an adequate evidentiary basis in the record to support an award of the requested damages. *See Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) ("[T]he court may rely on detailed affidavits or documentary evidence to determine the appropriate sum."); *see also Trustees of the Nat'l Asbestos Workers Pension Fund v. Ideal Insulation, Inc.*, ELH-11-832, 2011 WL 5151067, at *4 (D. Md. Oct. 27, 2011) (determining that, in a case of default judgment against an employer, "the Court may award damages without a hearing if the record supports the damages requested"); *Monge*, 751 F. Supp. 2d at 795 (same); *Pentech Fin. Servs., Inc. v. Old Dominion Saw Works, Inc.*, No. 6:09-cv-00004, 2009 WL 1872535, at *2 (W.D. Va. 2009) (concluding that there was "no need to convene a formal evidentiary hearing on the issue of damages" after default judgment because plaintiff submitted affidavits and records establishing the amount of damages).

Notably, under Fed. R. Civ. P. 54(c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." *See In re Genesys Data Techs, Inc.*, 204 F.3d 124, 132 (4th Cir. 2000) ("When a Complaint demands a specific amount of damages, courts have generally held that a default judgment cannot award additional damages.").  This is meant to enable the defendant to decide whether to expend the resources to defend the action. *Monge*, 751 F. Supp. 2d at 796.

## B. Analysis

Plaintiff has not sought an order of default pursuant to Fed. R. Civ. P. 55(a). Nonetheless, she seeks default judgment against Officer Paul. ECF 31; ECF 34. Notwithstanding that plaintiff has failed to comply with Rule 55, granting her a default judgment would violate Fed. R. Civ. P. 54.

Rule 54(b) permits the entry of final judgment as to one of multiple defendants if the court "expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). But, an order or decision "that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *Id.*

The Motion for Default Judgment does not address the implications of granting a default judgment as to only one of several defendants. This omission is of concern, in light of the principles articulated in *Frow v. De La Vega*, 82 U.S. (15 Wall.) 552 (1872).

In *Frow*, the plaintiff alleged that multiple defendants, including Frow, conspired to defraud him of land. 82 U.S. (15 Wall.) at 553. Frow failed to answer the complaint and the lower court entered a final decree against him. *Id.* Meanwhile, the other defendants answered the complaint and prevailed on the merits. *Id.* When the case reached the United States Supreme Court, Justice Bradley described this inconsistent result as "unseemly and absurd." *Id.* at 554. The Court said that, ordinarily, in order to avoid the risk of inconsistent judgments in a multi-defendant case, the proper course "is simply to enter a default" against the defaulting party, and to "proceed with the cause upon the answers of the other defendants." *Id.*; *see also* 10A Wright & Miller § 2690 ("As a general rule . . . , when one of several defendants who is alleged to be jointly

liable defaults, judgment should not be entered against that defendant until the matter has been adjudicated with regard to all defendants, or all defendants have defaulted."); *accord United States ex rel. Hudson v. Peerless Ins. Co.,* 374 F.2d 942, 944 (4th Cir. 1967); *Mullins v. River Docks, Corp.*, 791 F. Supp. 2d 511, 512 (E.D. Va. 2011); *Carter v. Rosenberg,* AMD-04-759, 2005 WL 782923, at *4 (D. Md. Apr. 7, 2005).

To my knowledge, the Fourth Circuit last addressed *Frow* in a reported opinion in 1967, in *United States ex rel. Hudson v. Peerless Insurance Company*, 374 F.2d 942 (4th Cir. 1967). There, the plaintiff brought an action against a contractor and the contractor's surety. *Id.* at 943. Although the contractor answered suit and denied liability, the surety failed to respond. The district court entered a default judgment against the surety, which appealed. *Id.* The Fourth Circuit reversed, ruling that the default judgment was premature. The Court acknowledged that "*Frow* was a case of joint liability," but it declined to cabin the case to its facts. *Id.* at 944. It opined: "[T]he procedure established for multiple defendants by Rule 54(b) is strikingly similar and applicable not only to situations of joint liability but to those where the liability is joint and/or several." *Id.* at 945. And, the Court went further, suggesting that the *Frow* rule applies not just where liability is joint and several but also where the liability of co-defendants is alleged to "'closely interrelated[.]'" *Id*. at 945 (citation omitted).

Thus, although other jurisdictions have cabined *Frow* to cases involving true joint liability, courts within the Fourth Circuit have adopted a broader approach, denying default judgment where the defendants' liability is premised on the same facts or causes of action. *See Southern Bank & Trust Co. v. Prosperity Beach, LLC*, 2014 WL 4976598 at *2 (E.D. Va. Oct. 3, 2014) (refusing to enter default judgment because plaintiff's "theory of recovery against [the responsive defendant] is largely subsumed by theory of recovery against [the defendant in default]" and those theory "rest

54

on common facts"); *Jefferson v. Briner, Inc.*, 461 F. Supp. 2d 430, 434-35 (E.D. Va. 2006) (declining to enter default judgment where defendants were "similarly situated"); *Phoenix Renovation Corp. v. Gulf Coast Software, Inc.*, 197 F.R.D. 580, 582-83 (E.D. Va. 2000).

Plaintiff seeks the very type of default judgment that *Frow* prohibits. Plaintiff's claims against Officer Paul, the BPD, Davis, and the Unknown Supervisors substantially overlap. She alleges that Officer Paul violated § 1983 by infringing her Fourth Amendment rights during a traffic stop. And, she alleges that the secondary defendants are liable under § 1983 because their deliberate indifference to or ignorance of a widespread practice of strip searches among BPD officers enabled Officer Paul to violate her rights. Thus, plaintiff's claims contain common elements, namely that she allegedly suffered a constitutional deprivation and Officer Paul was allegedly acting under color of state law. Moreover, the defaulting defendant could have potential defenses in common with the non-defaulting defendants, which, if successful, would inure to the benefit of the defaulting defendant. *See Peerless*, 374 F.2d at 944; *see also Richardson v. Bostick*, No. 5:11-CT-3045-FL, 2013 WL 3166398, at *4-5 (E.D.N.C. June 20, 2013) (declining to enter default judgment in § 1983 suit against prison guard, because defaulting defendant may be entitled to qualified immunity defendant).

As a result, it is inappropriate at this stage in the litigation to grant a default judgment against Officer Paul, given that the case is still pending as to the BPD, Davis, and the Unknown Supervisors. *See* Fed. R. Civ. P. 54(b). Thus, I shall deny the Motion for Default Judgment as premature, and without prejudice to plaintiff's right to renew it at the appropriate time.

### IV.    Motion for Attorneys' Fees

Fed. R. Civ. P. 4(d) establishes the procedures for waiver of service. Rule 4(d)(1) states: "An individual, corporation, or association that is subject to service under Rule 4(e), (f), or (h) has

a duty to avoid unnecessary expenses of serving the summons. The plaintiff may notify such a defendant that an action has been commenced and request that the defendant waive service of a summons." Under Fed. R. Civ. P. 4(d)(1), an effective notice and waiver must:

> (A) be in writing and be addressed:
>
>> (i) to the individual defendant; or
>>
>> (ii) for a defendant subject to service under Rule 4(h), to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process;
>
> (B) name the court where the complaint was filed;
>
> (C) be accompanied by a copy of the complaint, 2 copies of the waiver form appended to this Rule 4, and a prepaid means for returning the form;
>
> (D) inform the defendant, using the form appended to this Rule 4, of the consequences of waiving and not waiving service;
>
> (E) state the date when the request is sent;
>
> (F) give the defendant a reasonable time of at least 30 days after the request was sent—or at least 60 days if sent to the defendant outside any judicial district of the United States—to return the waiver; and
>
> (G) be sent by first-class mail or other reliable means.

If a defendant refuses to waive service without good cause, the court must impose the following on defendant: (1) "the expenses later incurred in making service"; and (2) "the reasonable expenses, including attorney's fees, of any motion required to collect those service expenses." Fed. R. Civ. P. 4(d)(2). "Under Rule 4(d)(2),[] the defendant is liable for the costs and expenses of follow-up service when the attempt to secure a waiver of formal service has been refused, as well as the reasonable expenses of any motion required to collect the costs of the follow-up service." WRIGHT & MILLER, § 1092.1 (emphasis added). However, compliance with the requirements set forth in Rule 4(d)(1) is a condition precedent to recovering attorney's fees and

costs. *See Suggs v. Cent. Oil of Baton Rouge, LLC*, 2014 WL 3374719 at *3 (M.D. La. July 9, 2014) (Bourgeois, M.J.) (denying attorneys' fees and costs incurred in serving defendant because "[f]ailure to comply with the specific requirements of Rule 4(d)(1) will foreclose any award of cost"); *Perez v. Cty. of Westchester*, 83 F. Supp. 2d 435, 441 (S.D.N.Y. 2000) (denying motion for reimbursement of service costs and attorneys' fees because "[t]he only request for waiver of personal service was made by [plaintiff's] lawyer in a letter to defense counsel"); *accord Armco, Inc. v. Pernod-Staufer Bldg. Sys., Inc.*, 733 F.2d 1087, 1089 n.1 (4th Cir. 1984) (observing that while "every technical violation of [Rule 4] or failure of strict compliance may not invalidate the service of process . . . . the rules are there to be followed, and plain requirements for the means of effective service of process may not be ignored").

Grim claims that she is entitled to recover $1,766.45 for the expenses incurred in serving Officer Paul. ECF 32 at 3. However, plaintiff has not demonstrated that she complied with Rule 4(d)(1). For one thing, she did not "address[]" the Waiver "to the individual defendant." Fed. R. Civ. P. 4(d)(1)(A)(i). Instead of Officer Paul, plaintiff directed the Waiver to Jeffries. ECF 14. And, based on the mailing addressed listed on the Waiver, it appears that plaintiff sent the Waiver to Kramon & Graham, P.A. in Baltimore rather than Officer Paul's residence, which is located in York, Pennsylvania. ECF 14.

Formalities aside, the docket does not reflect that Officer Paul received actual notice of the Waiver. As noted, the Waiver was sent to Jeffries, not Officer Paul. Therefore, plaintiff did not directly apprise Officer Paul or her request that he waive service. Nor is there a basis to conclude that Officer Paul learned of the Waiver from Jeffries. According to the letter the Court received from Jeffries on June 12, 2019, Officer Paul never responded to Jeffries' communications. ECF 33. Officer Paul's letter to the Court of March 22, 2019, in which he asks "why I have not received

any letter and/or information to this case," further suggests that he was unaware of the Waiver. ECF 16.  In light of the foregoing, plaintiff did not properly request a waiver of service, pursuant to Rule 4(d).  Accordingly, I shall deny the Motion for Fees.

## V.    Conclusion

For the foregoing reasons, I shall dismiss all claims against the City.  The BPD Motion is granted in part and denied in part.  In particular, I shall dismiss the *Monell* claim in Count I against Davis; I shall dismiss the failure-to-train claim lodged in Count I against the BPD; I shall dismiss Count II; and I shall dismiss Count IV.  However, the BPD Motion is denied as to the condonation claim lodged in Count I against the BPD.  And, I shall stay Count VII as against the BPD.  The Motion for Default Judgment is denied, as premature; the Motion for Fees is denied.

An Order follows, consistent with this Memorandum Opinion.


Date: November 8, 2019                              _____/s/_____
                                                    Ellen L. Hollander
                                                    United States District Judge